No. 20-56174

In the
# United States Court of Appeals for the Ninth Circuit

———

MATTHEW JONES, *et al.,*

          *Plaintiffs-Appellants,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California, *et al.,*

          *Defendants-Appellees.*

———

On Appeal from United States District Court
for the Southern District of California, Civil Case No. 3:19-cv-01226-L-AHG
(District Judge M. James Lorenz)

———

**Amicus Brief of Neal Goldfarb in Support of Neither Party,
Responding to the Parties' Supplemental Briefs
and Taking No Position as to Affirmance or Reversal**

———

Neal Goldfarb
1301 Fairmont St., N.W.
Washington, D.C. 20009
(202) 262-7886
goldfarbneal@gmail.com
*Counsel for Amicus Curiae*

May 3, 2021

## Contents

Table of Authorities ........ ii

Interest of Amicus ........ 1

Argument ........ 1

I. Appellants' criticisms of corpus linguistics are either unfounded or overstated. ........ 1

A. Appellants present a distorted view of how corpus linguistics is used in legal interpretation. ........ 1

1. The frequency hypothesis. ........ 2

2. Social and historical context. ........ 5

B. Although Appellants' remaining points are to some extent valid in a general sense, their significance is overstated, and they don't establish that corpus linguistics is unreliable. ........ 7

1. "Biases in favor of newsworthy or historically salient subjects." ........ 7

2. "Privileging elite usage over common usage." ........ 8

3. "A false illusion of scientific objectivity." ........ 9

C. Appellants do not contend that any of their criticisms apply to amicus's work on the Second Amendment. ........ 10

II. In their corpus analysis of *well regulated militia*, Appellants commit corpus-linguistic malpractice (and also one of the sins of which they accuse corpus linguistics generally). ........ 10

III. Appellees' discussion of corpus linguistics is flawed in several respects. ........ 11

Conclusion ........ 14

# Table of Authorities

## Cases

*In re Adoption of Baby E.Z.*, 266 P.3d 702 (Utah 2011) .............................................2

*District of Columbia v. Heller*, 554 U.S. 570 (2008).............................................6, 9

*Smith v. United States*, 508 U.S. 223 (1993).............................................................4

## Constitution

U.S. Constitution, Second Amendment .......................................................1, 5, 6, 10

## Other Materials

Neal Goldfarb, *A Lawyer's Introduction to Meaning in the Framework of Corpus Linguistics*, 2017 BYU L. Rev. 1359 (2018).......................2, 3, 13, 14

Neal Goldfarb, *A (Mostly Corpus-Based) Reexamination of* D.C. v. Heller *and the Second Amendment* (2019), available at bit.ly/Goldfarb2dAmAnalysis .......................................................................................6, 8

Neal Goldfarb, *Corpus Linguistics in Legal Interpretation: When Is It (In)appropriate?* (2019), available at bit.ly/WhenCorpLing............................2, 7

Neal Goldfarb, *The Use of Corpus Linguistics in Legal Interpretation*, 7 Ann. Rev. Ling. 473 (2020), available at bit.ly/GoldfarbAnnRevLing.......2, 3, 12

Neal Goldfarb, *Varieties of Ordinary Meaning: Comments on Kevin P. Tobia, "Testing Ordinary Meaning"* (2020), available at bit.ly/VarietiesOrdinaryMeaning................................................................3, 12, 13

Carissa Byrne Hessick, *Corpus Linguistics and the Criminal Law*, 2017 BYU L. Rev. 1503 (2018)........................................................................12

Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788 (2018).........................................................................2, 3

Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Penn. L. Rev. 261 (2019) ..............................................................................11

Stephen C. Mouritsen, *The Dictionary Is Not a Fortress: Definitional Fallacies and a Corpus-Based Approach to Plain Meaning*, 2010 BYUL Rev. 1915...................................................................................................2

Lawrence Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 BYU L. Rev. 1621..................6

Kevin Tobia, *Testing Ordinary Meaning*, 134 Harv. L. Rev. 726 (2020)...............12

## Interest of Amicus[1]

*Amicus* Neal Goldfarb previously filed an *amicus* brief in this case (with leave of Court) addressing the issues on which supplemental briefing had been ordered, in order to inform the Court of the corpus-based work he has done regarding the Second Amendment's original meaning. The purpose of this reply brief is to correct certain false and misleading information about corpus linguistics that is provided in the parties' supplemental briefs, and to point out a major flaw in Appellants' corpus analysis of *well regulated militia.*

## Argument

### I. Appellants' criticisms of corpus linguistics are either unfounded or overstated.

#### A. Appellants present a distorted view of how corpus linguistics is used in legal interpretation.

Appellants contend that "the 'frequency hypothesis' is unsound" and that "legal corpus linguistics ignores the history and context of legal texts."[2] Both arguments paint an inaccurate picture of how corpus linguistics is used in legal interpretation.

---

[1] No party's counsel authored any part of this brief. Nobody other than amicus and his counsel contributed any money to fund the brief's preparation or submission.

[2] Appellants' Supp. Br. 8, 17.

1

## 1. *The frequency hypothesis.*

**a.** Appellants argue that it makes no sense to say that the meaning of a word in a particular context should be determined on the basis of most frequent use of a word overall, without regard to context.[3] They are right in making that point, but they are wrong in arguing that as used in legal interpretation, corpus linguistics follows such a nonsensical approach.

As actually used in legal interpretation corpus linguistics (and more particularly, sense differentiation via frequency analysis) has always taken account of the context in which the relevant word or phrase appears in the statute, constitution, or other provision at issue.[4] Thus, what matters is not the most common use of the word

---

[3] *Id.* at 8-11.

[4] *See, e.g.*, *In re Adoption of Baby E.Z.*, 266 P.3d 702, 726-27, 728, 729 (Utah 2011) (Lee, J., concurring in part and concurring in the judgment); Stephen C. Mouritsen, *The Dictionary Is Not A Fortress: Definitional Fallacies and A Corpus-Based Approach to Plain Meaning*, 2010 BYUL Rev. 1915, 1957-58; Neal Goldfarb, *A Lawyer's Introduction to Meaning in the Framework of Corpus Linguistics*, 2017 BYU L. Rev. 1359, 1362, 1366-68, 1378-87 (2018) ("*A Lawyer's Introduction*"); Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788, 795, 821-24, 826 (2018); Neal Goldfarb, *Corpus Linguistics in Legal Interpretation: When Is It (In)appropriate?* (2019), ("*When Is Corpus Linguistics (In)appropriate?*") available at bit.ly/When CorpLing; Neal Goldfarb, *The Use of Corpus Linguistics in Legal Interpretation*, 7 Ann. Rev. Ling. 473, 476, 477-78 (2020) ("*Corpus Linguistics in Legal Interpretation*"), available at bit.ly/ GoldfarbAnnRevLing.

or phrase overall, but the most common use when the word or phrase appears in a context similar to its context in the legal provision.[5]

**b.** Contrary to what Appellants imply, it is not true that no justification has been offered for the frequency hypothesis.[6] Amicus has presented such a justification in two papers.[7] As those papers explain, one of the ways in which courts have fleshed out the idea of ordinary meaning has been to equate the ordinary meaning of a word or phrase with the way in which the word or phrase is "ordinarily used." That formulation is frequency-based by definition, because what happens "ordinarily" is what happens most of the time. And on the assumption that people typically speak and write in such a way that they are understood, the fact that the word-in-context or phrase-in-context is ordinarily *used* to convey a particular meaning is evidence as to how it is ordinarily *understood*.[8]

---

[5] *E.g.*, *A Lawyer's Introduction*, 2017 BYU L. Rev. at 1379; *Judging Ordinary Meaning*, 127 Yale L. J. at 795, 823; *Corpus Linguistics in Legal Interpretation*, 7 Ann. Rev. Ling. at 476, 477-78 (2020) (bit.ly/Goldfarb AnnRevLing).

[6] Appellants' Supp. Br. 11.

[7] *Varieties of Ordinary Meaning* at 2-8 (bit.ly/VarietiesOrdinary Meaning); *Corpus Linguistics in Legal Interpretation*, 7 Ann. Rev. Ling. at 476, 477-78 (bit.ly/Goldfarb AnnRevLing).

[8] *See Varieties of Ordinary Meaning*, at 5-8, 8 (bit.ly/VarietiesOrdinary Meaning); *Corpus Linguistics in Legal Interpretation*, 7 Ann. Rev. Ling. at 476-77 (bit.ly/Goldfarb AnnRevLing).

**c.** The foregoing justification for the frequency hypothesis disposes of Appellants' arguments relying on the assertions that "some plainly accepted uses of a word may not appear in a corpus *at all* "[9] and that "legal corpus linguistics often neglects non-prototypical uses of a term."[10] A use-in-context of a word or phrase that is acceptable, but nevertheless infrequent, or that is non-prototypical and infrequent, does not reflect the way the word-in-context or phrase-in-context is ordinarily used.

But this would not prevent such a use from being considered part of the word's ordinary meaning. The conception of ordinary meaning as "how the word-in-context is ordinarily used" is not the only conception of ordinary meaning that courts have articulated. Under a different conception, the fact that an infrequent use is deemed acceptable might suffice for it to be regarded as within the ordinary meaning.[11]

---

[9] Appellants' Supp. Br. 12 (emphasis in the original).

[10] *Id.* (cleaned up).

[11] *See, e.g.*, *Smith v. United States*, 508 U.S. 223, 230 (1993) ("it is both reasonable and normal to say that petitioner 'used' his [firearm] his drug trafficking offense by trading it for cocaine").
  Note, too, that it is doubtful that questions such as whether a blue pitta is a bird or an airplane is a vehicle present issues of word meaning all. Just as one wouldn't say that *spouse* or *parent* has two meanings—one for men and another for women—it makes little sense to say that *bird* has a different meaning for each avian species, or that *vehicle* has separate meanings for cars, trucks, airplanes, and whatever else it might be applied to.

## 2. *Social and historical context.*

Appellants fault corpus linguistics for (on their view) "ignor[ing] the history and context of legal texts."[12] But that argument is like criticizing bicycles because they can't mow lawns. Corpus linguistics, like most tools, has a function it was designed to perform, and like most tools it's not good at performing other functions. But that's no reason to throw the tool away.

And that isn't the only absurdity in Appellants' argument. For example, dictionaries resemble corpus linguistics in their inability to perform the kind of historical and political analysis that Appellants refer to. By Appellants' logic, therefore, dictionaries shouldn't be used in legal interpretation. And turnabout is fair play: historical and political analysis by itself cannot resolve issues of word meaning. So by Appellants' logic, it too gets thrown into the trash.

The *sensible* question to ask about how corpus linguistics analysis relates to historical inquiry is not whether corpus analysis by itself illuminates "the ideological and historical context of the Second Amendment right,"[13] but whether using corpus linguistics is somehow incompatible with considering such context.

The answer is no. When dealing with 230-year old texts, the disciplines of linguistics and history complement one another. For example, work by historians can

---

[12] Appellants' Supp. Br. 17.

[13] *Id.*

inform one's understanding of individual uses-in-context, and corpus linguistics can reduce the risk that someone doing historical analysis (whether a historian or a Supreme Court justice) will mistakenly assume that a particular word or phrase was used then in the same way that it is used now.

This complementary relationship can be seen in action in *amicus*'s work on the Second Amendment, in which his interpretation of the corpus data drew on historical scholarship and primary historical sources.[14] In contrast, the Court in *Heller* was mistaken abut how *bear arms* was ordinarily used during the Founding Era, and as a result its entire historical analysis is called into doubt.

A different approach to combining corpus linguistics with history is proposed by the important originalist scholar Lawrence Solum.[15] This approach, which Solum calls "triangulation," brings corpus linguistics together with two additional methodologies: (1) immersing oneself in "the linguistic and conceptual world of the authors and readers of the constitutional provision being studied," and (2) studying the "Constitutional Record," which includes "precursor provisions," drafting history, the ratification debates, early historical practice, and early judicial decisions.

---

[14] Neal Goldfarb, *A (Mostly Corpus-Based) Linguistic Reexamination of* D.C. v. Heller *and the Second Amendment* 53-56 (2019) ("*A (Mostly Corpus-Based) Reexamination*"), available at bit.ly/ Goldfarb2dAmAnalysis.

[15] Lawrence Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 BYU L. Rev. 1621.

**B. Although Appellants' remaining points are to some extent valid in a general sense, their significance is overstated, and they don't establish that corpus linguistics is unreliable.**

***1. "Biases in favor of newsworthy or historically salient subjects."***

Appellants' argument on this point is explicitly speculative: the corpus data "*may* merely represent biases in favor of newsworthy or historically salient subjects"; "a majority usage…*may* be measuring essentially irrelevant social facts."[16] But while such cases might exist, that suggests only that there are issues as to which using corpus linguistics is not appropriate—a point that amicus recognized and addressed two years ago.[17]

The way to deal with this possibility is to be sensitive to it when deciding whether to use corpus analysis, when deciding what data to collect, and when interpreting the results, not to rule out the use of corpus linguistics across the board.

For example, the risk that the results reflect social contingency rather than linguistic fact can be assessed by investigating whether and to what extent the corpus includes passages in which the relevant meaning is conveyed by expressions that are different from the one at issue and that do not raise the social-contingency risk.

---

[16] Appellants' Supp. Br. 13.

[17] Goldfarb, *When Is It (In)appropriate?* at 3-4, 26-53 (bit.ly/WhenCorpLing).

7

Thus, in a corpus analysis of *bear arms*, one can review the data for *carry arms*, as to which the results are unlikely to be skewed by the kinds of factors that Appellants refer to. Amicus has in fact reviewed that data, and it shows that in contrast to the scarcity of uses of *bear arms* to convey the meaning 'carry weapons,' people could and did do so by using *carry* arms.[18] As a result, Appellants' discussion of the social and historical circumstances of the Founding Era is a red herring.

2. *"Privileging elite usage over common usage."*

While *amicus* does not dispute the premise that the corpus data is dominated by what Appellants call "elite" usage, there are several reasons why that factor does not justify rejecting corpus analysis.

First, the perfect is the enemy of the good. While corpus linguistics, like all human creations, is imperfect, it is an improvement over established interpretive tools such as dictionaries.

Second, while there was undoubtedly variation in linguistic usage based on social differences such as urban versus rural, educated versus uneducated, what is important is not merely that such variation existed, but whether that variation makes a difference in interpreting the Constitution. For example, was there in fact variation

---

[18] *A (Mostly Corpus-Based) Reexamination* at 35-39 (bit.ly/Goldfarb2dAmAnalysis).

in how phrases such as *bear arms* were used and understood? Appellants don't try to answer that question, and *amicus* is unaware of any scholarship addressing the issue. So we are back where we started: the perfect is the enemy of the good.

Finally, legal interpretation has to *amicus*'s knowledge never paid any attention to the issue of "elite" versus "non-elite" usage. For example, the Supreme Court in *Heller* relied on Samuel Johnson's dictionary without worrying about whether it reflected the usage of the lower socioeconomic classes.[19] To the extent that the issue of elite versus non-elite usage is of concern, it is an issue that concerns legal interpretation generally, not just the use of corpus linguistics.

### 3. *"A false illusion of scientific objectivity."*

*Amicus* agrees that corpus analysis should not be seen in a way that gives it a "false façade of scientific objectivity."[20] What is objective about corpus analysis is the data; in other respects—*e.g.*, the interpretation of the data—the exercise of human judgment is necessary. It is unfortunate that some corpus-linguistics advocates of have made statements that have generated misimpressions of the kind that Appellants have fallen victim to.

---

[19] 554 U.S. at 581, 582, 597.

[20] Appellants' Supp. Br. 19.

In any event, the way to prevent corpus analyses from being given undue deference is to promote an accurate understanding of what it involves, not to reject it altogether.

### C. Appellants do not contend that any of their criticisms apply to amicus's work on the Second Amendment.

The discussion above has shown that to the extent that Appellants' have made valid points, the conclusion to be drawn isn't that corpus linguistics is inherently unreliable as an interpretive tool, but rather that its use is not appropriate for all issues and that anyone using it has to be careful and know what they are doing. Thus, Appellants' argument are properly directed not toward the use of corpus linguistics in general but to its use in particular cases, as to specific issues.

But Appellants don't contend that any of the concerns they have raised are applicable to *amicus*'s work on the Second Amendment. Indeed, they don't even mention it, or any of the other corpus analyses of the Second Amendment.

### II. In their corpus analysis of *well regulated militia*, Appellants commit corpus-linguistic malpractice (and also one of the sins of which they accuse corpus linguistics generally).

Although the Court's supplemental-briefing order directed the parties to brief the original meaning of *well regulated militia*, Appellants' corpus analysis deals only with the single word *militia*, rather than the phrase specified by the Court. Their

10

reason for doing so is unclear, but whatever the explanation, Appellants' analysis is a good example of how *not* to perform a corpus analysis.

Given the focus on context that characterizes the use of frequency analysis in legal interpretation, analyzing only one word out of a three-word phrase does not represent acceptable corpus-linguistic practice. As explained by Utah Supreme Court Justice Thomas Lee and his coauthor James Phillips, "The communicative content of a phrase isn't always the sum of its parts. This is the linguistic problem of 'compositionality': the meaning of a complex expression is sometimes a compositional function of the meanings of its semantic constituents, and sometimes not."[21]

Moreover, Appellants' treatment of *well regulated militia* is inconsistent with their criticism of the frequency hypothesis, By focusing on a single isolated word, Appellants have committed precisely the same sin that they wrongly impute to legal-interpretive corpus linguistics generally.

### III. Appellees' discussion of corpus linguistics is flawed in several respects.

Amicus will address here what he regards as the three most serious flaws in Appellees' discussion.

---

[21] Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Penn. L. Rev. 261, 283-84 (2019) (cleaned up).

First, Appelles quote Carissa Hessick's statement that "how often a term appears in newspapers, magazines, or other publications is a separate inquiry from how members of the public would understand that term when used in a statute."[22] Hessick's basis for that statement was the "newsworthiness" objection that is discussed above in connection with Appellants's argument.[23] Amicus has already explained that the objection shows only that some issues are not good candidates for using corpus linguistics.

Moreover, there is in fact a connection between relative frequency and likely understanding, as *amicus* has shown as part of his justification for the frequency hypothesis.[24]

Second, Appellees quote Kevin Tobia to the effect that the use of corpus linguistics might not "reliably track ordinary people's judgments about meaning."[25] But as *amicus* has shown elsewhere, the experiments on which Tobia based his con-

---

[22] Appellees' Supp. Br. at 18 (quoting Carissa Byrne Hessick, *Corpus Linguistics and the Criminal Law*, 2017 BYU L. Rev. 1503, 1509 (2017) ("*Hessick*")).

[23] *See Hessick*, *supra* note 22, at 1509.

[24] *Varieties of Ordinary Meaning* at 2-8 (bit.ly/VarietiesOrdinaryMeaning); *Corpus Linguistics in Legal Interpretation*, 7 Ann. Rev. Ling. at 476, 477-78 (bit.ly/GoldfarbAnnRevLing).

[25] Kevin Tobia, *Testing Ordinary Meaning*, 134 Harv. L. Rev. 726, 727 (2020) (quoted in Appellees' Supp. Br. at 18).

clusions were incapable of providing any relevant information about corpus linguistics.[26]

Third, Appellees refer to, and quote, one of *amicus*'s articles in a way that presents a misleading impression.[27] They say, "any corpus linguistics analysis would have to be careful not to conflate 'ordinary meaning' with 'most common meaning'" (citing amicus's article *A Lawyer's Introduction to Meaning in the Framework of Corpus Interpretation*, 2017 BYU L. Rev. at 13179), and then offer this quote from the same paragraph: "The meaning of a particular usage of a word is more likely to be determined by the immediate linguistic context in which it appears than by which sense of the word is the most frequent in general."[28] Taken together, these two statements can be read as suggesting that *amicus* opposes the use of frequency analysis.

But Appellees leave out the sentence that follows the language quoted above, which makes clear that what *amicus* opposes is the use of frequency analysis without limiting the search results to uses of the word at issue in the relevant type of context:

---

[26] *Varieties of Ordinary Meaning* at 1-5, 8-13 (bit.ly/VarietiesOrdinary Meaning).

[27] Appellees' Supp. Br. 24. (discussing and quoting *A Lawyer's Introduction*, 2017 BYU at 1379) (cleaned up).

[28] *A Lawyer's Introduction*, 2017 BYU L. Rev. at 1379 (quoted in Appellees' Supp. Br. 24).

"The relative frequency of different senses will typically be relevant only if the inquiry focuses on the specific usage that is at issue."[29]

## Conclusion

The discussion in this brief presents an overview of the issues that are discussed; there are details and complexities that it has not been possible to address. But amicus hopes that he made clear that although the use of corpus linguistics in legal interpretation has drawn criticism, the criticism is either groundless or overblown.

May 3, 2021.

Respectfully submitted,

/s/ Neal Goldfarb
1301 Fairmont St., N.W.
Washington, D.C. 20009
(202) 262-7886
goldfarbneal@gmail.com
*Counsel for Amicus Curiae*

---

[29] *Id.* (cleaned up).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  20-56174

I am the attorney or self-represented party.

**This brief contains**  2,948  **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ x ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  /s/ Neal Goldfarb     **Date**  May 3, 2021

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                           *Rev. 12/01/18*

## Certificate of Service

I HEREBY CERTIFY as follows:

1. On May 3, 2021, the foregoing brief was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

2. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: May 3, 2021

/s/ Neal Goldfarb
*Counsel for Amicus Curiae*